UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| REITA N. AGARWAL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:07-1149 |
| ) | Judge Echols |
| GORDON H. MANSFIELD, Acting ) | |
| Secretary of Veterans Affairs, ) | |
| Department of Veterans Affairs, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

This employment discrimination action brought under Title VII, 42 U.S.C. § 2000e *et seq.*, is before the Court on Defendant's Motion for Summary Judgment (Docket Entry No. 35). Plaintiff Reita N. Agarwal ("Dr. Agarwal") has responded in opposition to that Motion (Docket Entry No. 38), and Defendant has filed a reply (Docket Entry No. 44).

### I. FACTUAL BACKGROUND

Dr. Agarwal is a physician employed by the Department of Veterans Affairs ("VA") who worked in the Emergency Room at the Alvin C. York Medical Center Campus in Murfreesboro, Tennessee. It was her transfer from the Emergency Room and the failure to allow her to attend a leadership program which led to this litigation. The facts underlying Plaintiff's claims are construed in Plaintiff's favor and are as follows.

The Alvin C. York Medical Center is part of the Tennessee Valley Healthcare System, which is a part of the VA. Primary Care is a section of the Alvin C. York Medical Center consisting of the

1

Emergency Room,[1] outpatient clinics and a walk-in clinic which is called the Never Been Here Clinic. From September 10, 2000 until May 2005, Dr. Agarwal served as a Primary Care Physician in the Emergency Room. While employed in the Emergency Room, Dr. Agarwal had "core internal medicine privileges" which, she claims, consisted of the treatment of emergency medical conditions. Such emergency conditions included gun shot wounds, heart attacks, and internal bleeding.[2]

In 2004, while employed in the Emergency Room, Dr. Agarwal applied to the VA for permission to undertake a two-year MBA program at Vanderbilt University. To attend the program, Plaintiff would have to be excused from her clinic duties all day each Friday. She was approved to attend the program and tuition assistance was provided at the maximum rate of approximately $35,000.00. Clinic coverage was provided during the days Dr. Agarwal was away from the Medical Center.[3]

The Emergency Room where Dr. Agarwal worked was not without a certain amount of internal strife. Specifically, Dr. Agarwal admits she had some concerns about patient care, how the Emergency Room was organized, and the split in supervision as between medical services and nursing services.

---

[1]The Emergency Room was previously called the Evaluation Center. For the sake of consistency, it will be referred to in this Memorandum as the Emergency Room.

[2]Plaintiff lists these duties in her Affidavit and in her Statement of Facts. Defendant generally denies that these were her daily duties, but does not specify what those duties may have been other than her having "core internal medicine privileges" and admitting it was likely that Dr. Agarwal was proving acute care on a daily basis. In a Declaration filed with Defendant's response, Dr. Brian W. Christman ("Dr. Christman"), the Chief of Medical Services for the Tennessee Valley Health System of the VA, states that the practice in the Emergency Room would include the taking of patient histories, doing physical examinations, refilling prescriptions and assigning patients to sub-specialties. He also states that Dr. Agarwal did not treat gun shot wounds while in the Emergency Room. For present purposes, the Court must accept Dr. Agarwal's assertions as true.

[3]Plaintiff was awarded an MBA degree in May 2006.

On October 19, 2004, Dr. Agarwal requested reassignment from the Emergency Room. However, that request was not granted.

On April 25, 2005, Plaintiff sent two e-mails to Dr. Dharapuram Venugopal ("Dr. Venugopal"), the Chief Medical Officer of the Primary Care Division at the Alvin C. York Medical Center and Dr. Agarwal's immediate supervisor, in which she requested reassignment to the VA Nashville Campus. Instead of being sent there, however, she was "temporarily" reassigned to the Never Been Here Clinic effective May 9, 2005, where she would perform "new patient vesting examinations." (Docket Entry No. 41-3). In a Memorandum setting forth the transfer, Dr. Venugopal informed Dr. Agarwal the transfer was pursuant to her request and that she would remain on rotation with other physicians to provide attending duties on the acute medical ward. In the Memorandum, Dr. Venugopal also stated, "I hope this temporary reassignment meets your expectations. If you have any questions or concerns, please feel free to discuss them with me." (Id.) In a response e-mail sent to both Dr. Venugopal and Dr. Christman, Dr. Agarwal observed that she believed the transfer to the Never Been Here Clinic seemed "counter productive" and that she had requested that Dr. Venugopal transfer her to the Nashville Campus. (Docket Entry No. 41-6).

The duties of a physician in the Never Been Here Clinic are different from the duties of a physician in the Emergency Room. Dr. Agarwal claims that upon her reassignment, she began taking patient histories, doing routine physical examinations, refilling prescriptions, and assigning patients to sub-specialities.[4]

---

[4]Again, Defendant denies Plaintiff's portrayal of her duties. While Defendant admits that physicians in the Never Been Here Clinic perform vesting exams (which includes taking patients' histories, performing physical examinations, and assigning patients to sub-specialties) and have duties different than those of the Emergency Room physicians, Defendant disputes or denies the lists of duties Plaintiff sets forth in her Statement of Facts. Those denials are without citation to the record as required by Local Rule 56.01(c) and are unhelpful to the Court. Since Plaintiff sets forth her duties

3

On August 30, 2005, Dr. Agarwal filed a Charge of Discrimination with the Office of Resolution Management for the VA in which she claimed harassment and sex and national origin discrimination. The Office of Resolution Management attempted informal counseling to resolve the matter, but that was unsuccessful. During the course of this effort, Michael Fulton, an EEO Counselor for the VA, spoke with both Dr. Agarwal and Dr. Venugopal, but both declined mediation. On September 29, 2005, Plaintiff was given a Notice of Right to File Discrimination Complaint.

In October 2005, Plaintiff applied for training in the 2006 VISN 9 Leadership Institute ("Leadership Institute"). The Leadership Institute was developed over a decade ago as a form of succession planning and is designed to develop certain employees' leadership skills and increase their knowledge of the functions of the agency so they can later be tapped to manage and handle particular projects.

On October 11, 2005, Dr. Agarwal handed the Endorsement Form to Dr. Venugopal for him to fill out. Dr. Venugopal completed the Endorsement Form and marked the box "I do not recommend at this time." Dr. Venugopal also wrote the following comments:

> This course would be redundant in view of current MBA programme [sic] that already limits patient care activities. I feel further leadership training is not warranted at this time until conflict resolutions and working as a group is resolved.

(Docket Entry No. 46-10).

On October 13, 2005, Dr. Rex Janes, Acting Chief of Medicine at Alvin C. York Medical Center, sent an email to Dr. Christman in which he wrote:

> Several patient care issues have developed this past week re: Dr. Agarwal (patient A and patient B). I had a long meeting with the (patient A) family yesterday evening regarding their concerns with the attending's attitude (multiple complaints). I have discussed with Dr. Agarwal this morning to transfer the care of the patient to another

in her Affidavit, those will be accepted as true for present purposes.

4

attending team this morning. Hopefully this will avoid a congressional (or worse) from the family. Will keep you posted. Rex

(Docket Entry No. 41-13). Dr. Janes spoke to Dr. Agarwal about the situation and does not believe that she did anything wrong. Neither Dr. Janes nor Dr. Christman recall talking to each other about the e-mail.

On October 14, 2005, Dr. Agarwal was called into Dr. Venugopal's office. Dr. Agarwal testified that she was handed a copy of the Endorsement Form and could not believe Dr. Venugopal's comment about conflict resolution. When Dr. Agarwal asked Dr. Venugopal to explain he merely said, "You know." Dr. Agarwal told him that regardless of the comment, she was going to send her application in for consideration. Dr. Agarwal then left the office and showed the comments to the office administrator on the way out.

After the meeting with Dr. Agarwal, Dr. Venugopal met with Dr. Janes. Dr. Janes told Dr. Venugopal that if he left the comments on the Endorsement, the VA could be charged with retaliation given the discrimination complaint which had just been made by Dr. Agarwal. Dr. Venugopal also claims Dr. Janes told him to fill out another endorsement which recommended Dr. Agarwal for the program and leave it to the section chief to make a determination. According to Dr. Venugopal, Dr. Janes also indicated he would throw out the earlier endorsement.

Dr. Venugopal then filled out another Endorsement Form in which he removed the reference to "conflict resolutions,"[5] checked the box "I recommend and will support this candidate's participation in program if selected" and gave the new Endorsement Form to Dr. Janes. Dr. Janes,

---

[5] In his deposition in this case, Dr. Venugopal indicated that his reference to conflict resolution related to Dr. Agarwal's alleged problems in the Emergency Room.

5

in turn, provided the Endorsement Form to Dr. Agarwal who in turn forwarded it to Dr. Christman, her second level supervisor.

On October 24, 2005, Dr. Christman completed the Endorsement Form. While he recommended Dr. Agarwal and indicated he would fully support her were she chosen, he also wrote: "Several concerns: (1) Agree with Dr. Venugopal that this may be redundant with ongoing MBA training. (2) Recent reports of patient complaints while applicant was a ward attending raise concerns about interpersonal skills." (Docket Entry No. 42-2). The reference to recent complaints related to the e-mail received from Dr. Janes. Dr. Christman does not recall whether he independently investigated the patient complaints referenced by Dr. Janes.

A panel reviewed the various applications submitted.[6] However, Dr. Agarwal was not selected for the 2006 Leadership Institute and she learned of that decision on December 7, 2005. Dr. Agarwal was encouraged to apply for the next Leadership Institute.

Dr. Agarwal applied for the 2007 Leadership Institute. While Dr. Venugopal recommended Dr. Agarwal, he again wrote that the program could be redundant of the MBA program. Dr. Christman also recommended her, but agreed with Dr. Venugopal that nothing would be served from Dr. Agarwal's attendance at the Leadership Institute in light of the MBA program she had completed. (Docket Entry No. 36-14). Notwithstanding Dr. Venugopal's and Dr. Christman's comments on the Endorsement Form, Plaintiff was selected for the 2007 Leadership Institute.

Physicians working for the VA are paid according to an established pay scale which has various pay tables. Factors considered in setting pay include assignment, qualification, credentials

---

[6]The panel consisted of five members, among them Donna Fulton, Dr. Christman's Administrative Officer. She claims that she was not aware Dr. Venugopal had initially not recommended Dr. Agarwal, nor did Dr. Christman, or anyone else, influence her (or to her knowledge anyone on the panel) when it reviewed the applications.

6

and performance. Physicians in the Emergency Room are general paid under Table 1 or Table 2, with Table 2 being a higher pay scale.

On January 8, 2006, new pay ranges went into effect for physicians and dentists employed by the VA. This resulted in a review of salaries, including Dr. Agarwal's salary. Dr. Christman recommended an increase in Dr. Agarwal's salary which was approved and recommended by a compensation panel. However, Dr. Agarwal was paid under Table 1. In his Declaration filed in support of Defendant's Motion for Summary Judgment, Dr. Christman observed that Dr. Agarwal requested reassignment from the Emergency Room in April 2005, and had not been working in the Emergency Room for over eight months when the new pay tables went into effect. In his deposition, he admitted that had Dr. Agarwal been reassigned to the Emergency Room, he would have consulted with Human Resources to determine if Dr. Agarwal's pay should be determined from Table 2.

On February 22, 2006, the Office of Resolution Management sent a letter to David Pennington ("Pennington"), the Director of the Tennessee Valley Health System, informing him that an investigator had been assigned to investigate Dr. Agarwal's charges of discrimination. Shortly thereafter, on February 27, 2006, the investigator sent Pennington a letter which set forth that the Office of Resolution Managment was interested in resolving matters if possible and inquiring as to whether the Defendant would be interested in resolving the claims.

Six days later, on March 7, 2006, Dr. Venugopal sent a memorandum to Dr. Agarwal informing her that her assignment to the Never Been Here Clinic would "remain in effect until further notice." (Docket Entry No. 36-12). This memorandum was purportedly in response to a letter from the union. In testimony during administrative proceedings in this case, Dr. Venugopal explained that he believed there were some issues as between Dr. Agarwal and certain members of the nursing staff and that things were running smoothly in the Emergency Room without Dr. Agarwal's presence.

7

After exhausting her administrative remedies, Dr. Agarwal filed suit in this Court alleging retaliation in violation of Title VII. She claims retaliation occurred when Dr. Venugopal denied recommending Dr. Agarwal for leadership training in 2006 and when he indefinitely extended her temporary reassignment to the Never Been Here Clinic in March 2006.

## II. STANDARD OF REVIEW

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

8

### III. LEGAL ANALYSIS

As indicated, Dr. Agarwal's claims are based upon alleged retaliation. In the absence of direct evidence, retaliation claims are reviewed under the McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) framework. Vaughn v. Louisville Water Co., 2008 WL 499787 at *9 (6th Cir. 2008). "To establish a prima facie case of retaliation, a plaintiff must show that: 1) she engaged in activity protected by Title VII; 2) the employer knew of her exercise of protected rights; 3) the employer took a materially adverse action against the plaintiff or subjected her to severe and pervasive retaliatory harassment; and 4) there was a causal connection between the protected activity and the adverse action." Id. (citing Abbott v. Crown Motor Co., 348 F.3d 537, 542 (6th Cir. 2003)). Once a plaintiff establishes a prima facie case, the burden shifts to the defendant to show a legitimate non-discriminatory reason for its action. Abbott, 348 F.3d at 542. "If the defendant meets this burden, the plaintiff must then demonstrate by a preponderance of the evidence that the proffered reason was a mere pretext for discrimination by establishing that the proffered reason: 1) has no basis in fact; 2) did not actually motivate the adverse action; or 3) was insufficient to motivate the adverse action." Id.

In this case, Defendant contends Dr. Agarwal cannot establish a prima facie case of discrimination because she cannot show that she suffered a materially adverse employment action or that there was a causal connection between any adverse action and her protected activity. Defendant also claims that it had legitimate non-discriminatory reasons for its actions which Dr. Agarwal cannot show to be pretextual.

**A. Prima Facie Case – Adverse Employment Action**

Defendant asserts that Dr. Agarwal cannot show an adverse employment action, either with respect to the failure to reassign her back to the Emergency Room, or the denial of her 2006

9

Leadership Institute application.  Defendant argues both were *de minimus* employment actions, not materially adverse employment actions.

Under the Supreme Court's decision in Burlington Northern & Santa Fe Railway Co. v. White, 126 S.Ct. 2405 (2006), to be an "adverse employment action," it is not necessary that the action be some sort of "ultimate employment decision," such as hiring, granting leave, discharging, or demoting.  Instead, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Id. at 2415 (citations and quotation marks omitted). The Supreme Court then noted that it was "speaking of material adversity," because it "is important to separate significant from trivial harms." Id.

In Burlington Northern, the Supreme Court cautioned that Title VII protects individuals "not from all retaliation" but only from retaliation "that produces an injury or harm." For an injury or harm to be actionable, it must also rise to a requisite "level of seriousness."  Requiring that the material action dissuade a reasonable worker from making or supporting a charge of discrimination is necessary "to separate significant from trivial harms" and inconveniences. Burlington Northern, 126 S.Ct. at 2414-15.

Defendant first argues the failure to transfer Dr. Agarwal back to the Emergency Room was not an adverse employment action.  After all, it was she who requested to be transferred out of the Emergency Room in the first place, and a transfer does not amount to a materially adverse action.

While Dr. Agarwal did request to be transferred out of the Emergency Room, she did not request to be transferred to the Never Been Here Clinic.  To the contrary, on April 25, 2005, Dr. Agarwal wrote an e-mail to Dr. Venugopal requesting that she be transferred to the Nashville Campus

10

of the VA so she could utilize the emergency medical skills that she had developed and pointing out that she "liked" acute care medicine. (Docket Entry No. 36-7). Dr. Agarwal further indicated she did not want to be reassigned to one of the clinics at the Alvin C. York Medical Center. (Id.). Nevertheless, the following day Dr. Venugopal sent Dr. Agarwal a Memorandum in which he informed her that pursuant to her request she was being "temporarily reassigned" to the Never Been Here Clinic where she would perform "vesting examinations" and remain on rotation in the acute medicine ward. (Docket Entry No. 36-2). In response, Dr. Agarwal e-mailed both Dr. Venugopal and Dr. Christman expressing displeasure with being assigned to the Never Been Here Clinic and not the Nashville campus and stating that she wanted fair treatment and did not "want to feel wrongfully punished." (Docket Entry No. 41-5). Given this evidence, a question of fact exists as to whether Dr. Agarwal's transfer to the Never Been Here Clinic was really in response to a request made by her.

Defendant's assertion that a transfer does not amount to a materially adverse action is correct, at least to a point. The Sixth Circuit has indicated "it would appear that a purely lateral transfer or denial of the same, which by definition results in no decrease in title, pay or benefits, is not an adverse employment action for discrimination purposes." Momah v. Dominguez, 239 Fed. Appx. 114, 123 (6th Cir. 2007). Since an objective test is to be used, "an employee's subjective preference for one position over another is insufficient to render the denial of a purely lateral transfer an adverse employment action under the discrimination provision of Title VII." Id. at 124.

In this case, Dr. Agarwal has presented evidence from which a reasonable jury, applying an objective test, could determine transfers to the Never Been Here Clinic from the Emergency Room and vice versa are not purely lateral transfers. Dr. Agarwal has submitted an Affidavit in which she claims that her job duties were materially different when she worked in the Never Been Here clinic than when she worked in the Emergency Room. She claims that in the latter, she treated "emergency

11

situations including gun shot wounds, heart attacks, internal bleeds and other emergencies that presented daily," whereas in the former she was relegated to "taking patient histories, doing routine physical examinations, refilling prescriptions and assigning patients to sub-specialties." (Docket Entry No. 43).    While Defendant may dispute the exact nature of Dr. Agarwal's duties in the Emergency Room vis-a-vis the Never Been Here Clinic, the Court must accept Dr. Agarwal's depiction of her duties as true and that depiction suggests significantly different job responsibilities which can constitute an adverse employment action. Burlington, 542 U.S. at 761. Moreover, Dr. Agarwal has presented evidence from which a jury could conclude that were she assigned to the Emergency Room, her pay may have been based upon Pay Table 2 (and consequently higher). Clearly, less pay can constitute a materially adverse employment action. See, Clay v. United Parcel Serv. Inc., 501 F.3d 695, 710 n.6 (6th Cir. 2007)("We fail to understand how a loss of pay is anything other than an adverse employment action[.]"); Jordan v. City of Cleveland, 464 F.3d 584, 596 (6th Cir. 2006)("denial of money would more than amply qualify as a materially adverse action as to any reasonable employee for Title VII purposes.").

    Defendant also argues that Dr. Agarwal cannot show a materially adverse employment action in regard to the failure to assign her to the 2006 Leadership Institute. In this regard, Defendant asserts that while Dr. Venugopal initially wrote adverse comments on the endorsement, he later changed those comments and his initial comments had no effect on the ultimate outcome of whether Dr. Agarwal was selected to attend the 2006 Leadership Institute. This argument, however, really goes to the issue of causation which will be discussed in the next section. As for whether Dr. Agarwal's inability to attend the 2006 Leadership Institute constituted an adverse employment action, Dr. Agarwal has presented evidence from which a jury could reach that conclusion. Specifically, the parties agree that the Leadership Institute serves as a form of succession planning which develops

12

employees' leadership skills and increases their knowledge of the VA so that the graduates can handle different projects. While Dr. Agarwal attended the Leadership Institute a year later, a reasonable jury could conclude that this loss of a year had some effect on her potential advancement in comparison with her peers. See, Clay, 501 F.3d at 710 (delay in training can constitute materially adverse action when there are other ramifications, such as loss of pay); Ford v. General Elec. Lighting LLC., 121 Fed. Appx. 1, 7 (4th Cir. 2005)(loss of seniority constitutes adverse employment action).

**B. Prima Facie Case – Causation**

Defendant argues that Dr. Agarwal cannot show a causal link between the denial of her request to be returned to the Emergency Room and her protected activity. Specifically, Defendant observes that Dr. Agarwal did not write an e-mail to Dr. Venugopal until May 1, 2006 seeking a return to the Emergency Room, some eight months after her September 2005 charge of discrimination. Defendant argues this delay ameliorates any temporal connection between the events.

A close proximity in time between engagement in a protected activity and an adverse employment action may be sufficient to establish a causal connection between the two for purposes of establishing a prima facie case. Mikey v. Ziedler Tool and Die Co., 516 F.3d 516, 525 (6th Cir. 2008). "But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." Id. "The reason for this distinction is simple: if an employer immediately retaliates against an employee upon learning of his protected activity, the employee would be unable to couple temporal proximity with any such other evidence of retaliation because the two actions happened consecutively, and little other than the protected activity could motivate the retaliation." Id.

13

It is true that a span of eight months between a protected activity and an alleged adverse employment action would probably be insufficient, standing alone, to show a causal connection. Nguyen v. City of Cleveland, 229 F.3d 559, 566-67 (6th Cir. 2000)(collecting cases) (noting that cases which permit a prima facie case to be made on the proximity of time between a protected activity and an adverse action are usually less than six months). However, Defendant's portrayal of the facts neglects to consider certain events which occurred between the filing of Dr. Agarwal's charge and Dr. Venugopal's conversion of Dr. Agarwal's assignment at the Never Been Here Clinic from temporary to indefinite.

On February 22, 2006, the Office of Resolution Management wrote Director Pennington and informed him that it was assigning an investigator to conduct an investigation into the discrimination charges filed by Dr. Agarwal. Indisputably, those discrimination charges included Dr. Agarwal's claim related to her "temporary reassignment" to the Never Been Here Clinic. On February 27, 2006, the investigator wrote Director Pennington and informed him about the dispute resolution process. That letter was received by the VA on March 1, 2006. Less than a week later, on March 7, 2006, Dr. Venugopal, purportedly in response to an inquiry from the union, wrote Dr. Agarwal and informed her that her position at the Never Been Here Clinic would "remain in effect until further notice."

Given these facts, a jury could conclude that there was a causal connection between the filing of the charge and Defendant's refusal to return her to work in the emergency room. The letter from the Office of Resolution Management and the purported inquiry from the union suggests a continuing desire on Dr. Agarwal's part to return to the Emergency Room. Notwithstanding the pendency of the discrimination claim and on the heels of the letters from the Office of Resolution Management, Dr. Venugopal decided that Dr. Agarwal stemporary assignment would be changed to an indefinite assignment. A reasonable jury could conclude that this was in retaliation for Dr. Agarwal filing a

14

charge of discrimination, particularly since "the burden of establishing a *prima facie* case in a retaliation action is not onerous but one easily met." Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir. 2000). See, Gribcheck v. Runyon, 245 F.3d 547, 551 (6th Cir. 2001) (showing that litigation was ongoing at the time of the adverse action is sufficient to establish the causation element).

Defendant also argues Dr. Agarwal cannot show causation regarding the denial of her application to attend the 2006 Leadership Institute. While Dr. Venugopal may have written comments about Dr. Agarwal's alleged conflict resolution problems, Defendant maintains such statements were true – Dr. Agarwal had problems with the staff when she worked in the Emergency Room. Moreover, Dr. Venugopal's comments were not forwarded to the review panel and Dr. Christman claims he did not see those comments before he filled out the Endorsement Form.

While Dr. Agarwal may have in fact had disputes with the nursing staff, a reasonable jury could conclude that Dr. Venugopal's comments relating to conflict resolution were in reference to Dr. Agarwal going outside the system and filing a charge of discrimination which Dr. Venugopal received just days before he wrote the comments on the Endorsement Form. A reasonable jury could find that if Dr. Venugopal was in fact referencing Dr. Agarwal's inability to get along with other staff members and his comments were not a veiled reference to the EEOC charge which had just been filed, he would not have needed to delete the comments and certainly would not have needed to delete his other comments relating to Dr. Agarwal's alleged inability to be a team player.

Further, while Dr. Christman claims he was unaware of Dr. Venugopal's comments when he filed out the Endorsement Form and the review committee did not receive those comments, what it did receive was Dr. Christman's notation that there were recent reports of patient complaints and concerns about Dr. Agarwal's "interpersonal skills." Interestingly, the recent report of patient complaints came from Dr. Janes via his October 13, 2005 e-mail, the very person who allegedly

15

counseled Dr. Venugopal that his comments could be viewed as retaliatory and who allegedly destroyed a copy of Dr. Venugopal's original Endorsement which contained the negative comments. Dr. Christman did not independently investigate the complaints referenced in Dr. Janes' e-mail and Dr. Janes did not state that Dr. Agarwal had done anything wrong. Nevertheless, the committee received Dr. Christman's comments about patient complaints.

To be sure, this chain of events is not conclusive. However, to survive summary judgment, a plaintiff in an employment discrimination or retaliation case is not required to present "smoking gun" evidence on the issue of causation. See, Beeker v. Humana Health Plan Inc., 229 F.3d 662, 670 (7th Cir. 2000); Bevan v. Honeywell, Inc., 118 F.3d 603, 609 (8th Cir. 1997). Instead, a plaintiff's obligation is to present evidence from which a reasonable jury could conclude that her protected activity was a motivating factor behind the challenged conduct, see, Scott v. Stone, 254 Fed. Appx. 469, 473 (6th Cir. 2007), and the Court finds that Dr. Agarwal has done so in this case.

**C. Legitimate Non-Discriminatory Reasons and Pretext**

Defendant claims that it had legitimate non-discriminatory reasons for its employment decisions. Defendant also claims that Dr. Agarwal cannot show those reasons to be pretextual.

In regard to the 2006 Leadership Institute, Defendant asserts that Dr. Venugopal's comments about conflict resolution were true in that Dr. Agarwal had conflicts with personnel in the Emergency Room. This Court has already noted, however, questions of fact exist as to what Dr. Venugopal was really referencing when he made the comments about conflict resolution.

Defendant also argues the comments made by Dr. Venugopal and Christman concerning Dr. Agarwal's MBA program were true. That is, Dr. Agarwal's time for providing patient care was limited by her MBA course load, and it would be further limited if she were enrolled in the Leadership Institute.

16

While that may be so, the Court does not know how much information the review committee had before it about the MBA program when it made its decision, or whether other applicants may have had similar circumstances that limited their time for making rounds. What the Court does know is that in the Endorsement Form section on the 2006 application, Dr. Venugopal wrote: "[t]his course may be redundant in view of current MBA program" and Dr. Christman wrote: "[a]gree with Dr. Venugopal that this may be redundant with ongoing MBA training." (Docket Entry No. 42-2). In the Endorsement Form section of the 2007 Application, Dr. Venugopal wrote, "[t]his training may be redundant in view of her M.B.A." and Dr. Christman wrote, "agree with Dr. Venugopal → this training does not seem to add anything to the MBA training, sponsored by VA, that this physician has already received." (Docket Entry No. 36-14). Despite the remarkably similar language in the two Endorsement Forms, Dr. Agarwal was selected to attend the 2007 Leadership Institute, but not the 2006 Institute. Given this record, a question of fact exists as to whether Dr. Agarwal's participation in the MBA program was the real (and non-discriminatory) reason for her not being selected to participate in the 2006 Leadership Institute.

As for the refusal to return Dr. Agarwal to the Emergency Room, Defendant asserts that Dr. Venugopal was of the opinion "that some of the same personnel were still in the Emergency Room in 2006 and that to reassign Plaintiff to the Emergency Room would not be best." (Docket Entry No. 36 at 15). In response, Dr. Agarwal notes that in testimony during the administrative proceedings, Dr. Venugopal identified certain individuals with whom Dr. Agarwal purportedly had conflicts, including Dr. Mark Wilson ("Dr. Wilson") and Health Technicians Karen Purdom ("Purdom") and Angie McPeak ("McPeak"). However, Dr. Wilson left the Emergency Room in December 2005, months before Dr. Venugopal changed Dr. Agarwal's status at the Never Been Here Clinic from temporary to indefinite. As for Purdom, she did not work on the same shift with Dr. Agarwal since

17

some time in 2003 and their conflict dated back to a concern in 2001. For her part, McPeak testified in her deposition that while she "had a problem with some of her [Dr. Agarwal's] ways," she could continue to work with Dr. Agarwal in the Emergency Room, (McPeak Depo. at 33-34), yet Dr. Venugopal did not ask McPeak whether she could resume working with Dr. Agarwal before he changed Dr. Agarwal's assignment at the Never Been Here Clinic from temporary to indefinite. Clearly these facts raise questions about the legitimacy of Dr. Venugopal's claim that Dr. Agarwal' presence would disrupt the Emergency Room. As such, summary judgment is not warranted.

## IV. CONCLUSION

On the basis of the foregoing, Defendant's Motion for Summary Judgment (Docket Entry No. 35) will be denied and an appropriate Order will be entered.

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

18